# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| STATE OF WASHINGTON, | No.  59693-8-II |
| Respondent, | |
| v. | |
| MARK ANDREW LAURILA, | UNPUBLISHED OPINION |
| Appellant. | |

PRICE, J. — Mark A. Laurila loaned money to his son, Marky.[1]  When Marky said that he could not pay back the loan, Laurila became angry.  A physical altercation resulted, during which Laurila swung a knife at Marky.  Laurila was arrested.

Following a trial, Laurila was convicted of attempted first degree murder—domestic violence (DV) and felony harassment—DV.

Laurila appeals, arguing that (1) the trial court erred when it excluded testimony that Marky had assaulted him in the past, and (2) there was insufficient evidence to prove that he acted with premeditation.  We affirm.

---

[1] Because the defendant and his son share the same first and last names, we refer to the defendant as "Laurila" and his son as "Marky" to avoid confusion.  This is consistent with the testimony of multiple witnesses on how to distinguish between the two.

FACTS

I. BACKGROUND

On September 7, 2023, Laurila and his son Marky got into a heated argument about a loan, which escalated into a fight. Laurila swung a knife at Marky, and Marky repeatedly punched Laurila as he tried to remove the knife from Laurila's possession. Both Marky and Laurila sustained injuries. Marky received a deep wound to his hand that required surgery, as well as cuts on his wrist and leg. Laurila had two broken ribs and a cut on his thumb.

Laurila was arrested and charged with one count of attempted first degree murder—DV and one count of felony harassment—DV. Both charges included deadly weapons enhancements. The case proceeded to a jury trial.

II. MOTIONS IN LIMINE

The State brought two motions in limine that were related to a previous altercation between Marky and Laurila that had occurred in 2013. This 2013 incident resulted in Marky being convicted of fourth degree assault in 2015. The trial court considered the two motions together.

A. EXCLUSION OF MARKY'S PRIOR CONVICTION

The State's first motion in limine requested the exclusion of Marky's 2015 assault conviction under ER 609.[2] The defense objected, arguing that Laurila would be asserting self-defense and, thus, Marky's prior conviction would be relevant. The defense contended that the

---

[2] ER 609 "allows evidence of criminal convictions only when the convictions are for crimes punishable by more than one year or that involve dishonesty." *State v. Andy*, 182 Wn.2d 294, 304, 340 P.3d 840 (2014). These convictions also generally cannot be admitted if they are over 10 years old. ER 609(b).

evidence would provide context for Laurila's state of mind and help explain the reasonableness of his conduct given that he had been a victim of Marky's violence in the past.

The State responded that "simply there [was] no vehicle to get [Marky's] conviction into evidence." 2 Verbatim Rep. of Proc. (VRP) at 227. The State explained that because the actual assault had occurred in 2013 (over 10 years ago) and was a misdemeanor, there was no evidence rule that would allow the conviction to be admitted.

The trial court granted the State's motion. The trial court explained that under ER 609, prior convictions were allowed to be admitted only "under very specific circumstances," none of which were met by Marky's 2015 assault conviction. 2 VRP at 2230.

B. EXCLUSION OF TESTIMONY REGARDING PRIOR PHYSICAL ALTERCATIONS BETWEEN LAURILA AND MARKY

The State's second motion in limine was broader; rather than being limited to Marky's 2015 conviction, the State's motion requested exclusion, under ER 404,[3] of *any* testimony about any prior altercations between Marky and Laurila (including the 2013 incident underlying the 2015 conviction) until Laurila had established its relevance to a claim of self-defense. In its motion (labeled motion in limine no. 3), the State asserted,

> [T]he State anticipates Defense will elicit testimony from the listed victim and/or other witnesses regarding prior incidents where the listed victim is alleged to have fought with the Defendant. Any testimony regarding these incidents should be

---

[3] ER 404 generally bars evidence used to show that "a person acted in conformity with a character trait on a particular occasion." *State v. Bell*, 60 Wn. App. 561, 564, 805 P.2d 815, *review denied*, 116 Wn.2d 1030 (1991). Except that ER 404(a) permits evidence of a person's *reputation* to be admitted in certain circumstances (such as a victim's reputation for violence if the defendant is claiming self-defense). *Id.* And ER 404(b) permits the admission of specific instances of a person's conduct for a non-propensity purpose. *State v. Crossguns*, 199 Wn.2d 282, 289-90, 505 P.3d 529 (2022).

excluded as inadmissible character evidence. Further, any testimony regarding these prior incidents are not relevant until the Defendant first makes a showing of self-defense.

2 VRP at 227-28.

As with the previous motion in limine, defense counsel objected on the basis that prior instances where Marky had attacked Laurila were relevant to Laurila's state of mind. Defense counsel also specifically objected to this procedure in which any testimony would have to await Laurila first making a showing of self-defense. Counsel contended that it would be "awkward" during trial for Marky to testify as the State's witness, then for Laurila to testify and lay the foundation for self-defense, and then for Marky to retake the stand again to discuss the 2013 incident. 2 VRP at 228. Instead, defense counsel proposed that, even before Laurila takes the stand, counsel should be able to cross-examine Marky (or other witnesses) during the State's case-in-chief about whether Marky and Laurila had "gotten into fights before" or if "this [was] the first time something like this ha[d] happened." 2 VRP at 231.

The State responded that it was not seeking to completely restrict testimony about prior physical altercations between Laurila and Marky, only that Laurila would first need to lay the foundation for its relevance.

> [I]f the Defendant—based on that scheme that I just heard, if the Defendant wants to take the stand and say, "My son beat me up ten years ago," I can't stop him from doing that. Different than an assault conviction coming into evidence, there has to be a showing of self-defense before that becomes applicable. Otherwise, it's not relevant.
>
> So, if he wants to take the stand and say this is what my son has done to me, that's fine.

2 VRP at 228.

4

The State reiterated that it would not object to Laurila recalling the State's witnesses. So long as Laurila testified and laid a foundation that he stabbed Marky in self-defense or that he had felt afraid of Marky because of their past fights, then the defense could, if it wanted, recall Marky or other witnesses to ask about those past fights.

Defense counsel, the State, and the trial court then appeared to come to an understanding about what kind of testimony would be allowed, with the State alluding to the requirements of ER 404(a) and ER 404(b):

> THE COURT: So, I think [Laurila] can testify to concerns that he has about interactions with his child[] . . . I guess, [defense counsel], are you—with the ruling that the conviction is off the table, are you wanting to get in with [Marky] just information generally about their relationship and the physical nature of the relationship?
>
> [DEFENSE COUNSEL]: Yeah, that they've gotten in fights before, and this isn't the first time something like this has happened.
>
> . . . .
>
> [THE STATE]: Here's my understanding of the way that works, after reading. You can't get into—[defense counsel] can't get into specific incidents of conduct. If the Defendant testifies, [defense counsel] can get into specific incidents of conduct. The only way [defense counsel] can get into the violent nature of . . . the victim, is by reputation evidence. Now, because it goes towards [Laurila's] state of mind in a self-defense case and the reasonable apprehension, that's why [defense counsel] can get into the specific incidents of conduct.
>
> THE COURT: The Defendant, by way of his testimony?
>
> [THE STATE]: By way of his testimony.
>
> THE COURT: Correct. . . .

2 VRP at 231-32.

Following the discussion, the trial court granted the State's motion in limine no. 3. The trial court ruled that unless and until Laurila laid the foundation for self-defense with his own testimony about his state of mind, the defense could only ask Marky vaguely about his "rocky

relationship" with Laurila, but the defense could not ask "specific questions regarding physical altercations between the parties on previous occasions." 2 VRP at 232.

After the ruling, the trial court suggested that defense counsel would have to weigh the risks of whether to ask Laurila about past physical altercations with Marky, because it could open the door for the State to introduce additional testimony about the 2013 incident that could potentially be harmful to Laurila.[4]

## III. TRIAL TESTIMONY

Trial began on March 27, 2024, with the State calling witnesses for its case-in-chief.

## A. MARKY'S TESTIMONY

Marky testified that around August 2023, Laurila had loaned him $1,500 so that Marky could buy a car. Marky thought he was going to have started a new job and would be able to pay his dad back quickly; however, his job plans fell through, and he was unable to pay Laurila back.

Marky testified that at first Laurila had been understanding of his situation; however, "it quickly escalated." 2 VRP at 337. He remembered that Laurila had come to his home in the middle of the night twice "screaming and yelling in the middle of the street." 2 VRP at 338. Marky told Laurila not to come by his house anymore. And if Laurila came back, Marky would beat him up or the neighbors would call the police. Marky testified that Laurila had continued to call and send him text messages asking him to repay the loan.

---

[4] The State told the trial court that it had reason to believe that if Marky were to testify about the 2013 incident, Marky would explain that he had held Laurila in a "headlock" because Laurila had been attacking him with a knife—showing that Laurila "has a history of knife offense[s]." 2 VRP at 229.

Marky testified that on September 7, the day of the incident, he had plans to visit his half-sister, Kassandra Westom. He told her how Laurila had shown up at his house in the middle of the night and was now repeatedly sending him text messages. Marky showed Westom the text messages from Laurila, including one where Laurila told Marky to meet him at a nearby boat launch to talk about the loan.

Because the boat launch was only a few miles away from Westom's home, Westom suggested that she and Marky "stop by there and let [Laurila] say what he has to say." 2 VRP at 340. Marky agreed, and he and Westom (along with Westom's three-year-old daughter) drove to the boat launch.

At the boat launch, Marky said that his conversation with his dad had "started off tense, but not volatile." 2 VRP at 343. Marky explained to Laurila that he was starting a new job in the next few days and that after he started working, he would be able to start repaying the loan. Laurila did not respond well to his explanation, and things "quickly escalated" from there. 2 VRP at 343.

At some point, Westom got involved, and that was when the argument "fully escalated the rest of the way." 2 VRP at 343. Marky remembered that Westom had made a comment about Laurila not being her father anymore and that Laurila's actions were causing Laurila to lose his relationships with his children. Laurila responded by calling Westom "a lot of vile names." 2 VRP at 344. He called her a "bitch," a "cunt," and a "whore." 2 VRP at 344. Marky told Laurila not to talk to Westom like that.

Laurila "started yelling" and moving towards Marky and Westom. 2 VRP at 345. Marky said that he had stepped forward and put his hands out to prevent Laurila from getting closer.

Marky said that although he had put his arms up as Laurila approached, he did not touch or threaten Laurila.

It was then that Laurila attacked Marky with a knife. Marky described,

> I extended my arms to create distance for him to not be able to get in between, and he, like, had his hand by his hip and swung the knife forward, and that's when I had to bring one of my hands back because he was swinging at my neck.

2 VRP at 346. Marky said that he had tried to block Laurila's attack with his hand, but Laurila stabbed him through his palm. Marky then punched Laurila, and the two of them began wrestling on the ground. Laurila kept swinging his knife at Marky, screaming that he was going to kill Marky and then kill himself. While they were on the ground, Laurila cut Marky twice on his left wrist and then three times on his right leg, and Marky repeatedly punched Laurila, trying to get the knife away from him.

At some point, a nearby stranger intervened. The stranger helped get the knife away from Laurila and continued to wrestle with him. After Marky was able to get away from Laurila, Marky and Westom left in their car to take care of his injuries. Because Marky's wounds would not stop bleeding, he eventually went to the hospital for surgery.

Marky completed his testimony by admitting to a series of convictions from between 2019-2021 that were admissible under ER 609. Neither the State nor defense counsel asked him about his 2015 assault conviction against Laurila.

B. JASON PHELAN'S TESTIMONY

The State called Jason Phelan to testify. Phelan was Laurila's friend who was present at the boat launch and observed the incident with Marky.

Phelan testified that the night before the incident, he and Laurila had stayed overnight in a trailer together. Phelan said that Laurila had been "really upset" with Marky about the loan. 2 VRP at 256. And Laurila told Phelan that Marky was no longer responding to any of Laurila's messages.

Phelan testified that Laurila had said that he would "stab" Marky if Marky did not repay him.

> [Laurila] said that if he didn't get his money, or if he didn't get a hold of him and didn't get his money, that if he didn't pay him, his son didn't pay him, that he would have [to] get his money out of him somehow. He would either ruin the car or take the car.
>
> . . . .
>
> He said that he would—he would stab him; that he would cut him, leave him lying bloody in the street.

2 VRP at 257.

Phelan said that the next day, he and Laurila drove to the boat launch and spent the morning sitting in the trailer "just relaxing and talking." 2 VRP at 257. When Marky and Westom arrived at the boat launch, Laurila went outside the trailer to talk to Marky.

Phelan's testimony about what happened next largely mirrored Marky's. According to Phelan, the conversation between Laurila and Marky fully escalated after Westom got involved. Although Marky became visibly more upset, Phelan said that Marky did not threaten Laurila or raise his fist or arm at Laurila at that point.

Laurila and Marky then "both kind of puffed up," got in each other's faces, and "bumped chests." 2 VRP at 263. "That's when [Laurila took] a step back, and at the same time, he had pulled out his pocket knife out of his pocket and flicked it open." 2 VRP at 263-64. Phelan

remembered that Laurila had said to Marky, something to the effect of, "Come on, I'll stab you" or that he would "cut" Marky. 2 VRP at 264.

Phelan said that Laurila then started swinging the knife at Marky, "trying to stab him in the side" and saying that he was going to "stab," "cut," and "kill" Marky. 2 VRP at 264. Laurila tried to stab Marky "repeatedly, four or five times, before they went down to the ground." 2 VRP at 265.

On the ground, Marky wrestled with Laurila, trying to get control of the knife. Laurila continued trying to stab Marky while threatening him "[t]he whole time." 2 VRP at 265. Marky then managed to get on top of Laurila, hold him down, and punch him repeatedly, trying to get the knife out of Laurila's hand.

Laurila eventually managed to drive the knife into Marky's leg while they were on the ground. Phelan described,

> [Laurila] got it to [Marky's] leg, and I was standing about five feet away, saw him put it on his leg, and he was pushing as hard as he could, and I saw the knife cut into his leg.

2 VRP at 265.

Phelan testified that Marky and Laurila did not stop fighting until a bystander intervened. The stranger "came up and . . . got on [Laurila]'s back, and [Marky] was kind of on his side . . . and put [Laurila] in a choke hold." 2 VRP at 266. Marky was then able to gain control of Laurila's knife and get away.

Phelan testified that after the fight was over, Laurila said that he was going to kill himself.

C. WESTOM'S TESTIMONY

Westom provided testimony that was generally consistent with Marky's and Phelan's testimony.

On the day of the incident, Marky had plans to come over to Westom's house to spend time with Westom and her kids. While they were together, Marky asked Westom to help him block Laurila's number because they had been having a conflict. Westom testified that she had been the one who suggested that Marky meet with Laurila at the boat launch.

Westom said that the conversation between Marky and Laurila had started out "calm," but it eventually grew "heated." 2 VRP at 298-99. At some point, Laurila had called her a "bitch" and a "cunt," and Marky had told Laurila not to talk to her that way, and then Laurila had reacted by pulling out a knife.

Westom said that then Laurila had pulled out a knife and swung it at Marky, telling him over and over that he was going to "f***ing kill [him]." 2 VRP at 303. She said that Marky had tried to block Laurila's knife with his hand, and then Marky and Laurila had started wrestling on the ground. She described,

> [Laurila] just kept telling my brother that he was going to f***ing kill him. My brother was punching him to get the knife away. It took a while. Finally, my brother [and a stranger] got the knife away, threw it into some bushes. And that's when [Laurila] was saying that he just wanted to kill himself, or he just wanted to die, as he was crying.

2 VRP at 304.

D. BONNIE NOBLIN'S TESTIMONY

Bonnie Noblin, Marky's mother, testified about some text messages that she had received from Laurila on the day of the incident. The messages, which appeared to have been sent by

Laurila *prior* to the incident, were related to the fact that Marky had not paid Laurila back for a

loan.  One message said,

> Lonnie[5] doesn't care anymore.  That's telling me Lonnie isn't going to pay me intentionally, and Marky's okay with it, and then Marky isn't going to pay either. I'm losing it, Bonnie.  I don't want to live if that's the case.  Before I take myself out, I'll kill Lonnie and I'll hurt Marky.

2 VRP at 323.  In another text, Laurila repeated to Bonnie that he would "hurt" Marky.  2 VRP at

324.

In later messages, which appear to have been sent *after* the incident, Laurila asked Noblin

whether Marky had been severely injured from their fight.  He tells her that if Marky is "hurt bad,"

he will kill himself.  2 VRP at 324.  Noblin and Laurila then have the following exchange:

> [Noblin:] He is hurt bad.  He is in surgery right now.  You should have left it alone like I asked you.  You and me ended the minute you stabbed my son.  You are on your own.
>
> . . . .
>
> [Laurila:] Did he call the cops?  I talked to him about the guy who was attacking me after he left and was going to make me go with him, but I jumped in the truck and ran.  He kept running into the back of me.  Please tell me when he gets out of surgery.

2 VRP at 325-26.

The State rested.  There was no testimony about any prior altercations between Laurila and

Marky.

---

[5] From our record, "Lonnie" appears to be one of Marky's roommates.

E. LAURILA'S TESTIMONY

The defense began its case with Laurila taking the stand. Laurila testified that he had been trying to talk with his son so that they would work out a payment plan for the loan. He did not want to fight, he wanted to "de-escalate" and approach the issue in a calm manner. 2 VRP at 403. Laurila said that Marky had refused to talk to Laurila when he came by Marky's house to discuss the issue, and that Marky eventually told him, "Since you keep asking me, I'm not going to pay you back." 2 VRP at 404. Laurila also said that Marky had threatened to beat him up if he came to Marky's house again.

It was at this point that Laurila texted Marky's mother, Noblin, and told her that he couldn't take it anymore and that he wanted to "hurt" Marky. 2 VRP at 406. Laurila said that when he sent these messages, he had been very emotional and was "venting," and that he had never wanted to kill his son. 2 VRP at 405.

Laurila next gave his account of the incident with Marky, which was sharply different from the other witnesses. That morning, Laurila had been outside his trailer at the boat launch and had been cutting some rope to secure the trailer's generator when Marky showed up. Laurila said that Marky had come straight up to him and "chest bumped" him, causing him to back up into his truck. 2 VRP at 408. Laurila said that he had tried to "back[] off" and calm things down but that Marky "was screaming at [him] at the top of his lungs." 2 VRP at 409. Laurila said that he had kept trying to deescalate the argument but that Marky, and eventually Westom, just kept screaming at him. After he realized that the conversation was not going to be productive, he said, "I'm done. I don't want to argue no more" and tried to go back inside the trailer. 2 VRP at 409.

As Laurila was leaving, Westom made comments about him not being a father to his children. Laurila admitted that he reacted in that moment and called her a "bitch." 2 VRP at 410.

Laurila said that, at that point, Marky came up to him and punched him. Laurila tried to block Marky's fist, but Marky hit him on the side of the head. Laurila felt himself falling back and reached for his knife. Laurila said that Marky came at him again and "everything went black." 2 VRP at 411. The next thing Laurila remembered was yelling at Marky to get off him. Laurila then tried to get away from Marky and, not realizing the knife was still in his hand, accidentally stabbed Marky in the leg. Laurila also said that at one point Marky reach for Laurila's knife and ended up getting cut in the hand. Eventually, a bystander broke up the fight, and Marky left.

Laurila testified that at no point did he tell Marky that he was going to kill him. He also denied any plan to "trick Marky into coming [to the boat launch]." 2 VRP at 415.

After Laurila finished his testimony, the defense rested. Laurila did not testify about any past fights or other issues with Marky. At no point did defense counsel ask Laurila about whether Marky had assaulted him in the past or whether he had any past experiences that would cause him to be afraid of Marky. Defense counsel also did not attempt to recall any of the State's witnesses to provide any further testimony.

## IV. JURY INSTRUCTIONS AND VERDICT

When the trial court discussed jury instructions with the parties, defense counsel requested that the trial court give, in addition to the State's proposed instructions, a self-defense instruction, as well as instructions for the lesser crimes of second degree attempted murder, first degree assault, and second degree assault. The State agreed to the additional instructions.

14

The jury was instructed that to convict Laurila of attempted first degree murder, they would have to find that Laurila took a substantial step toward the commission of the premeditated murder of Marky. If the jury did not find that Laurila was guilty of attempted first degree murder, the jury was instructed that it could find him guilty of the lesser crime of attempted second degree murder. Attempted second degree murder required that Laurila had taken a substantial step toward intentionally causing Marky's death (but without premeditation).

Laurila was found guilty and convicted of attempted first degree murder—DV and felony harassment—DV. Both convictions received deadly weapons enhancements.

Laurila appeals.

ANALYSIS

Laurila argues that the trial court violated his right to present a defense when it excluded evidence that he asserts was vital to his self-defense claim. He further contends that there is insufficient evidence to convict him of attempted first degree murder.

I. RIGHT TO PRESENT A DEFENSE

Laurila argues that the trial court erred when it (1) excluded Marky's 2015 conviction for assaulting Laurila and (2) "excluded" evidence regarding prior incidents when Marky had "beat up" Laurila. Br. of Appellant at 16. Laurila contends these rulings violated his constitutional right to present a defense because this evidence was essential to his self-defense claim. We disagree.

Under the state and federal constitutions, all criminal defendants possess " 'the right to a fair opportunity to defend against the State's accusations.' " *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)); Const. art. I, § 22; U.S. CONST. amend. VI. Although the constitutional

15

right to present a defense is "basic to our system of jurisprudence," it is not absolute. *Jones*, 168 Wn.2d at 720. Judges have the discretion to " 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues.' " *State v. Jennings*, 199 Wn.2d 53, 63, 502 P.3d 1255 (2022) (alterations in original) (internal quotation marks omitted) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

To analyze whether a defendant's right to present a defense has been violated, we use a two-step process. *Id.* at 58-59. The first step involves reviewing the trial court's rulings under the evidence rules. *Id.* If we find a prejudicial evidentiary error at the first step, we stop and " 'avoid the constitutional issue altogether.' " *Id.* at 59 (quoting *State v. Jennings*, 14 Wn. App. 2d 779, 800-01, 474 P.3d 599 (2020) (Melnick, J., concurring)).[6] But if there was no evidentiary error, or if the error was harmless, we move to the second step, which involves reviewing de novo whether the exclusion of evidence violated the defendant's constitutional right to present a defense. *Id.* at 58-59.

A. THE FIRST STEP—WAS THERE AN EVIDENTIARY ERROR?

For the first step, we review the trial court's decision to admit or exclude evidence under the evidence rules for an abuse of discretion. *Id.* An abuse of discretion occurs when an evidentiary decision is manifestly unreasonable or based on untenable grounds or reasons. *State*

---

[6] "We should refrain from deciding a case on constitutional grounds unless it is absolutely necessary." *Jennings*, 14 Wn. App. 2d at 800 n.6.

*v. Gentry*, 183 Wn.2d 749, 761, 356 P.3d 714 (2015). Application of an incorrect legal standard is an abuse of discretion. *Id.* at 764.

Laurila's argument focuses on the State's two related motions in limine. First, Laurila argues that the trial court abused its discretion when it granted the State's motion that requested the exclusion of Marky's 2015 assault conviction under ER 609. Laurila appears to contend that the conviction was admissible, not for impeachment under ER 609, but rather for the purpose of supporting his theory of self-defense. Laurila also contends that his defense "depended on his credibility, that [Marky] and not he was the aggressor." Br. of Appellant at 16.[7]

Second, Laurila argues that the trial court erred by granted the State's second, related motion in limine (motion in limine no. 3) that excluding testimony regarding prior incidents where Marky "beat up Laurila" (including the 2013 incident that is the basis of Marky's 2015 conviction). Br. of Appellant at 16.

Both of these arguments, being related to evidence of past events, are properly analyzed under ER 404(b). ER 404(b) prohibits evidence of "other crimes, wrongs, or acts" to prove "the character of a person in order to show action in conformity therewith." But ER 404(b) generally "permits admission of evidence of prior bad acts for purposes other than propensity, 'such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.' " *State v. Crossguns*, 199 Wn.2d 282, 289-90, 505 P.3d 529 (2022) (quoting ER 404(b)).

---

[7] To the extent that Laurila is suggesting that the 2015 conviction was admissible for impeachment purposes under ER 609, he would be incorrect. ER 609 "allows evidence of criminal convictions only when the convictions are for crimes punishable by more than one year or that involve dishonesty." *Andy*, 182 Wn.2d at 304. These convictions also generally cannot be admitted if they are over 10 years old. ER 609(b). Marky's 2015 fourth degree assault conviction meets none of the requirements for admission under ER 609.

Before admitting evidence of a person's prior acts, the trial court must " '(1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.' " *State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Vy Thang*, 145 Wn.2d 630, 642, 41 P.3d 1159 (2002)). Although it is "better practice" for the trial court to articulate its findings on the record for each of these four steps, "if the record shows that the trial court adopted one of the parties' express arguments," then a failure to conduct a complete ER 404(b) analysis on the record is not reversable error. *State v. Asaeli*, 150 Wn. App. 543, 576 n.34, 208 P.3d 1136, *review denied*, 167 Wn.2d 1001 (2009).

Here, Laurila's argument for the admission of the evidence of both Marky's 2015 conviction and the conduct that led to the conviction appears to be tied to one of the exceptions included in ER 404(b). Laurila suggests that this evidence would not have been admitted for the forbidden purpose of propensity, but rather that this evidence was relevant to his state of mind, which, in turn, supported his claim for self-defense.

It is well settled that a defendant may claim self-defense where they have a " 'subjective, reasonable belief of imminent harm from the victim.' " *State v. Grott*, 195 Wn.2d 256, 266, 458 P.3d 750 (2020) (quoting *State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996)). In order to receive a jury instruction on self-defense, the defendant bears the initial burden of producing "some evidence" that they had a reasonable apprehension of imminent harm and that their conduct "occurred in circumstances amounting to self-defense." *State v. Janes*, 121 Wn.2d 220, 237, 850 P.2d 495 (1993).

Accordingly, a viable claim of self-defense can make prior interactions between the defendant and the alleged victim admissible under ER 404(b). "Evidence of a victim's violent actions may be admissible to show the defendant's state of mind at the time of the crime and to indicate whether [they] had reason to fear bodily harm." *State v. Burnam*, 4 Wn. App. 2d 368, 376, 421 P.2d 977, *review denied*, 192 Wn.2d 1003 (2018); *see also United States v. Saenz*, 179 F.3d 686, 688 (9th Cir. 1999) ("[E]xtrinsic evidence concerning a victim's past acts is admissible under Rule 404(b) to show defendant's state of mind."); *United States v. Armajo*, 38 F.4th 80, 84 (10th Cir. 2022) ("[S]pecific instances of a victim's conduct, when known to the defendant, may be admitted to prove the defendant's state of mind in a self-defense case.").

For example, in *United States v. Armajo*, the defendant was charged with assault for stabbing his uncle during a physical altercation. 38 F.4th at 82. The 10th Circuit upheld the trial court's admission, under Federal Rule of Evidence 404(b), of evidence that the uncle had previously assaulted the defendant.[8] *Id.* at 84. The evidence was characterized as "pivotal" to the issue of the defendant's state of mind on the issue of self-defense because it could show that the defendant "had good reason to fear [his uncle] and therefore to believe it necessary to meet force with force." *Id.* at 83.

---

[8] The Federal Rule of Evidence 404(b) shares nearly identical language with Washington's ER 404(b), making federal authorities about the rule persuasive. *See* Fed. R. Evid. 404(b); *In re Det. of Pouncy*, 168 Wn.2d 382, 392 n.9, 229 P.3d 678 (2010) ("Where our evidence rules mirror their federal counterparts, we may look to federal case law interpreting the federal rules as persuasive authority in interpreting our own rules.").

*Armajo*'s rationale could have applied here to make evidence of past interactions admissible. But unlike in *Armajo*, Laurila fell short of demonstrating the relevance of his state of mind related to these incidents.

Because of its breadth, we focus first on the State's motion in limine no. 3, which pertained to all prior incidents between Laurila and Marky, including the 2013 incident (and not *just* the fact of Marky's related 2015 conviction). In this motion, the State acknowledged that once Laurila established this relevance, the evidence could be admitted. The State outlined the considerations under ER 404(b) as it proposed a process through which Laurila would be able to admit testimony of the past acts, but only after Laurila established the foundation for the relevance of his state of mind.[9]

The trial court agreed, ruling that before Laurila could elicit testimony regarding the 2013 incident when Marky strangled Laurila, Laurila would have to testify that he had acted (to some degree) out of fear tied to Marky's past actions against him. Only then would these past acts be relevant to Laurila's state of mind and to his claim of self-defense. Once that relevance was established, the trial court appeared willing to allow Laurila to admit evidence of the past interactions with Marky under ER 404(b).[10]

---

[9] "You can't get into—[defense counsel] can't get into specific incidents of conduct. If the Defendant testifies, [defense counsel] can't get into specific incidents of conduct. The only way [defense counsel] can get into the violent nature of . . . the victim, is by reputation evidence. Now, because it goes towards [Laurila's] state of mind in a self-defense case and the reasonable apprehension, that's why [defense counsel] can get into the specific incidents of conduct." 2 VRP at 231-32.

[10] While the trial court did not explicitly discuss the ER 404(b) factors on the record, the State was clearly explaining its position based on ER 404. And the record shows that "the trial court adopted [the State's] express arguments." *Asaeli*, 150 Wn. App. at 576 n.34.

Yet Laurila never established the predicate foundation for the relevance of his state of mind. Although given the opportunity during his own testimony, Laurila never testified that he was fearful of Marky because of past interactions. It is plausible that defense counsel made a strategic decision to not solicit this testimony because of the potential testimony from Marky in response. But regardless of why Laurila did not offer this testimony, his failure to do so meant his state of mind was never relevant.

We agree with the trial court's reasoning. Without Laurila laying the foundation of his state of mind relating to his self-defense claim, there was no basis to introduce evidence about the underlying incident (that led to the 2015 conviction). Nor was there any cause for the trial court to complete the four-steps of the ER 404(b) balancing test when Laurila did not even attempt to establish step 3 (relevance). In its ruling on the State's motion in limine no. 3, the trial court only conditionally excluded testimony about prior physical altercations, "until [Laurila] first ma[de] a showing of self-defense." 2 VRP at 227-28. Under the rules of evidence, we see no abuse of discretion in the trial court's handling of this potential evidence.[11]

B. THE SECOND STEP—WAS THERE A CONSTITUTIONAL VIOLATION?

Having concluded that there was no evidentiary error, we move to the second step—de novo review of whether the trial court's ruling violated Laurila's constitutional right to present a defense. *Jennings*, 199 Wn.2d at 58.

---

[11] Having concluded that the trial court did not err in its ruling on the State's motion in limine no. 3, we need not address Laurila's argument about the trial court's exclusion of Marky's actual 2015 conviction. Laurila's failure to establish relevance of prior acts, including the 2013 incident underlying the 2015 conviction, is fatal to the admission of the conviction itself.

Here, as explained above, testimony regarding the prior assaultive behavior between Laurila and Marky (and the resulting 2015 conviction) was not relevant. Laurila was required to establish the relevance of his state of mind—a showing that was entirely in Laurila's hands during his testimony, but a showing that Laurila decided, for whatever reason, not to make. Accordingly, there was no deprivation of Laurila's right to present a defense because there is no protected right for a defendant to present irrelevant evidence. *See Jones*, 168 Wn.2d at 720 (holding that only relevant evidence is subject to constitutional protection for the right to present a defense). Thus, the trial court's decision to grant the State's motion in limine did not deprive Laurila of his Sixth Amendment right to present a defense.

## II. SUFFICIENCY OF THE EVIDENCE

Laurila also argues that there is insufficient evidence to support his conviction of attempted first degree murder. We disagree.

A sufficiency of the evidence claim admits the truth of the State's evidence and all reasonable inferences that can be drawn from that evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All such inferences "must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.* Direct and circumstantial evidence are equally reliable. *State v. Miller*, 179 Wn. App. 91, 105, 316 P.3d 1143 (2014). After properly viewing the evidence in a light most favorable to the State, we determine whether any rational finder of fact could find that all the elements of the charged crime were proven beyond a reasonable doubt. *State v. Roberts*, 5 Wn.3d 222, 231, 572 P.3d 1191 (2025).

To prove attempted first degree murder, the State must prove that the defendant took a substantial step toward causing the death of another person with premeditated intent. RCW

9A.32.030(1)(a); RCW 9A.28.020(1). Premeditation is " 'the deliberate formation of and reflection upon the intent to take a human life' and involves 'the mental process of thinking beforehand, deliberation, reflection, weighing, or reasoning for a period of time, however short.' " *State v. Pirtle*, 127 Wn.2d 628, 644, 904 P.2d 245 (1995) (quoting *State v. Gentry*, 125 Wn.2d 570, 597-98, 888 P.2d 1105 (1995)).

The State may prove premeditation through circumstantial evidence so long as "the inferences drawn by the jury are reasonable and the evidence supporting the jury's findings is substantial." *Id.* at 643. Evidence of prior threats, disputes, or quarrels between the defendant and the victim supports an inference of premeditation. *State v. Powell*, 126 Wn.2d 244, 261, 893 P.2d 615 (1995). Other circumstantial evidence can include motive, stealth, procurement of a weapon, multiple wounds inflicted on the victim, or assault with multiple means. *State v. Ra*, 144 Wn. App. 688, 703, 175 P.3d 609 (listing examples of circumstances that support premeditation, including "motive, prior threats, multiple wounds inflicted or multiple shots, striking the victim from behind, assault with multiple means or a weapon not readily available, and the planned presence of a weapon at the scene."), *review denied*, 164 Wn.2d 1016 (2008); *Pirtle*, 127 Wn.2d at 644 (explaining that premeditation can be proved by procurement of a weapon and stealth).

Laurila argues that the State failed to meet its burden to show that he possessed premeditated intent. He points out that he did not "lie in wait" or "hunt down" Marky, nor did he arm himself with a knife specifically to attack Marky. According to Laurila, the incident with Marky happened so quickly that there was no " 'appreciable amount of time' " during which he could have formed a premeditated intent to kill Marky. Br. of Appellant at 24 (quoting *State v. Bingham*, 105 Wn.2d 820, 824, 719 P.2d 109 (1986)). At most, the circumstantial evidence could

23

have established that Laurila had an intent to kill Marky *during* the altercation, but there is insufficient evidence to show that such intent was premeditated.

We are not persuaded. While Laurila is correct that the State did not provide evidence of Laurila "lying in wait" for Marky, the State provided testimony from multiple witnesses who discussed Laurila's motive, previous threats to Marky, and infliction of multiple wounds on Marky.

For example, it was undisputed that the night before the incident, Laurila told both Phelan and Noblin that he wanted to "hurt" Marky, that "he would stab him[,] that he would cut him, leave him lying bloody in the street." 2 VRP at 257, 323. And, following these threats, Laurila told Marky to meet him at the boat launch. Then (considering the State's evidence as true), it was Laurila who attacked Marky first, swinging a knife. And Laurila did not stop after he stabbed Marky in the hand, he continued to attack Marky and forcefully plunged his knife into Marky's leg, stopping only because a bystander intervened. Westom, Phelan, and Marky all testified that the entire time he and Marky fought, Laurila repeatedly yelled, consistent with his previous threats, that he was going to "kill" Marky. 2 VRP at 265, 304, 347. Laurila also stated on several occasions during this short window of time that he did not want to live anymore and, at least once, linked hurting Marky with this desire to end his own life.

Although contrary inferences are possible, if we construe all of the inferences in favor of the State, a reasonable juror could infer that Laurila formed an intent consistent with his threats, invited Marky to the boat launch, and attempted, perhaps as part of a murder-suicide, to kill Marky by stabbing him multiple times. Accordingly, Laurila's sufficiency of the evidence argument fails.

No. 59693-8-II

CONCLUSION

We affirm Laurila's convictions.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

VELJACIC, A.C.J.

CHE, J.